Alison **NOWAK, a Minor, By and Through her Parent and Natural Guardian, Leo NOWAK; Amy Nowak, a Minor, by and through her Parent and Natural Guardian, Leo Nowak; Leo Nowak, Individually; and Elizabeth Nowak, Individually, Plaintiffs,**

v.

**FABERGE U.S.A., INC.; and Precision Valve Corporation, Defendants.**

**Civ. No. CV 90–1919.**

United States District Court, M.D. Pennsylvania.

Nov. 13, 1992.

Michael J. Cefalo, Lesa S. Gelb, Cefalo & Associates, West Pittston, PA, for plaintiffs.

David L. Pennington, Ernest J. Bernabei, III, Harvey, Pennington, Herting & Ren-

neisen, Ltd., Patrick T. Ryan, Drinker, Biddle & Reath, Philadelphia, PA, Cody H. Brooks, Kreder, O'Connell, Brooks & Hailstone, Scranton, PA, for defendants.

## MEMORANDUM AND ORDER

NEALON, District Judge.

On April 7, 1992, a jury verdict was returned against defendant Faberge[1] in this products liability case for serious burn injuries sustained by the minor plaintiff when she punctured a can of Aqua Net hair spray resulting in the ignition of the spray when it came into contact with the flame from a gas stove. The jury found that the valve system in the hair spray can was defective when it was distributed for sale by Faberge because it failed to operate properly and was also defective because it did not contain adequate warnings. On the separate theory of design defect in the hair spray formulation,[2] the jury found for the defendant. The jury found that those defects were the proximate cause of Alison's injuries and awarded her[3] $1,500,000.00. Defendant Faberge filed post-trial motions for judgment notwithstanding the verdict, *see* Fed.R.Civ.P. 50, and for a new trial, *see* Fed.R.Civ.P. 59. *See also* documents 179 and 203 of record. The plaintiff has filed both a reply and a brief in opposition to the defendant's motions. *See* documents 185 and 206 of record. Oral argument was held on August 5, 1992, and the motions are now ripe for disposition. For reasons which follow, the defendant's motions for judgment notwithstanding the verdict, or, in the alternative, for a new trial, will be denied.

## I.

### MOTION FOR JUDGMENT N.O.V.

 In deciding a motion for judgment n.o.v., the record is reviewed in the light

---

1. At the close of the plaintiff's case, the defendant, Precision Valve Company, moved pursuant to Fed.R.Civ.P. 50 for a directed verdict which the court granted on the ground that there was no evidence that the product was defective when it left Precision's possession. Accordingly, for purposes of this Memorandum, the term "defendant" hereinafter refers only to Faberge U.S.A., Inc.

2. The plaintiff had argued that the Aqua Net product's formulation was defective because it contained a flammable propellant as opposed to a water-based, nonflammable propellant, however, the jury rejected this theory.

3. The defendant moved for, and was granted, a directed verdict pursuant to Fed.R.Civ.P. 50 against plaintiffs Amy Nowak, Leo Nowak and Elizabeth Nowak. For purposes of this Memorandum, "plaintiff" refers to only Alison Nowak.

most favorable to the verdict-winner, *Link v. Mercedes–Benz*, 788 F.2d 918 (3rd Cir. 1986), and the motion must be denied "unless the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief". *Dawson v. Chrysler Corp.*, 630 F.2d 950, 959 (3rd Cir.1980). The motion will be addressed with those principles in mind.

## A.

### FACTUAL BACKGROUND

Faberge manufactures the product "Aqua Net Hair Spray" by assembling component parts, inserting the liquid solvent under pressure and applying the labeling language on the can. The valve assembly component involved here was purchased from Precision Valve Company, one of three suppliers. The main ingredient in the solvent is alcohol and a liquified propellant to activate the spray is mixed into and dissolved in the solvent. A rosin is also inserted in order to hold the hair in place upon application. (The can in question contained an "extra super hold" rosin, which was larger in amount and created more film than the standard spray and could cause clogging on the surface of the valve assembly.) At one time, a non-flammable fluorocarbon propellant was utilized but had to be discontinued because it caused environmental problems in the ozone layer. In fact, a fluorocarbon propellant spray was not only non-flammable, but could actually put out a fire. As a result, hydrocarbons, butane and propane, were substituted as propellants for the non-flammable fluorocarbon. Butane and propane are extremely flammable, more so than gasoline, and are considered to be dangerous.

After the fluorocarbons were discontinued in favor of hydrocarbons, Faberge concluded that it would be to its advantage for marketing purposes if consumers would not perceive any change in the product. The marketing department at Faberge had the final word as to the warning to be placed on the product, and it was decided that "everything must be made to appear the same" even after being made aware that a more hazardous material was now involved. This decision was made notwithstanding the fact that reports Faberge received from the Consumer Products Safety Commission, as well as consumer complaints directly to the company, disclosed incidents of consumers being injured while puncturing aerosol cans near an open flame.

On April 2, 1989, plaintiff's sister, Amy Nowak, purchased the can of Aqua Net hair spray at an Acme Market. The front of the can contained the language "FREE! 33% MORE" and the label "AQUA NET" in large letters. There was no wording on the top of the can. The back of the can contained the usual product promotional claims as well as the ingredients against a light violet background and, in the middle between the claims and the ingredients, and of the same color (white), the following information appeared:

CAUTION: FLAMMABLE. DO NOT USE NEAR FIRE OR FLAME OR WHILE SMOKING.

WARNING: Avoid spraying in eyes. Contents under pressure.

Do not puncture or incinerate.

Do not store at temperature above 120° F.

Keep out of reach of children. Use only as directed. Intentional misuse by deliberately concentrating and inhaling the contents can be harmful or fatal.

This lettering was of lesser size and prominence than the references on the front and back of the can to "FREE! 33% MORE"; "AQUA NET"; and "HAIR SPRAY."

Amy Nowak attempted to use the product that night but it wouldn't spray. When she pushed the nozzle down "nothing came out." Later, plaintiff tried it but "it didn't work as it should, the spray came out in spurts." When plaintiff started to spray the next evening, "it didn't work at all." She had previously used an Aqua Net product from a pump bottle, as well as a spray can, and didn't know the differences between the contents of each. It was her belief that she could remove the contents from the spray can and pour it into a pump

bottle. Additionally, she thought that she would be able to remove the top with a can opener and, when this was tried unsuccessfully, she punctured the side of the can. The spray spurted out and came in contact with an open flame on a nearby gas stove, of which she was unaware, and enveloped her in flames causing serious burns to her head and body. The extent of the injuries and the amount of damages awarded has not been challenged.

## B.

### VALVE SYSTEM

■ As previously noted, the product did not operate as it was intended inasmuch as the spray initially came out in spurts and then not at all. The valve assembly was destroyed and/or lost, and was unavailable for inspection and analysis. Consequently, plaintiff proceeded on the malfunction theory to establish the defect. A plaintiff may "... prove a defect in a product with evidence of the occurrence of a malfunction and with evidence eliminating abnormal use or reasonable secondary causes *for the malfunction.*" *Rogers v. Johnson & Johnson Products, Inc.,* 523 Pa. 176, 565 A.2d 751, 754 (1989). (Emphasis Supplied) The resolution of these factual issues was for the jury which was properly instructed on plaintiff's burden to eliminate abnormal use or reasonable secondary causes *for the malfunction.* The malfunction in this case was the failure of the valve assembly to operate and there was no evidence indicating abnormal use that could have caused the valve to malfunction. As to reasonable secondary causes, there was evidence of a potential for clogging of the valve but Faberge would be responsible for this cause inasmuch as the solution was inserted in the can by Faberge. The alleged misuse of the can by puncturing it occurred after the malfunction and is relevant on the issue of proximate cause. However, even misuse by the consumer doesn't provide an absolute defense in a strict liability case because "[u]nder Pennsylvania Law, only unforeseeable contributory conduct by the consumer will insulate the manufacturer

from strict products liability, and the question of foreseeability is for the jury." *Petree v. Victor Fluid Power, Inc.,* 831 F.2d 1191, 1195 (3rd Cir.1987). The misuse must be extraordinary and "... whether the act is reasonably foreseeable [is] to be determined by following retrospectively the sequence of events and looking back from the harm to the negligent act rather than by considering whether the defendant should prospectively have envisioned the events which unfolded and caused the accident". *Baker v. Outboard Marine Corp.,* 595 F.2d 176, 183 (3rd Cir.1979). As previously pointed out, the warnings on the can specifically advised against puncturing and avoiding proximity to a flame and, consequently, it is difficult to understand how the manufacturer can claim that the puncturing in this case near a flame was unforeseeable. In fact, the defendant's expert witness, Craig Clauser, admitted that it was foreseeable that a purchaser would puncture the can. The effort is made by defendant to distinguish the language referring to the puncture from that of the open flame, but this distinction is completely unpersuasive. The jury was properly instructed on the issue of foreseeability, both as to defect and proximate cause, and accepted the plaintiff's position. In sum, it concluded that the valve was defective; that it was foreseeable that plaintiff would puncture the can in an effort to remove the contents; and that the product might be used near fire or flame.

## C.

### ADEQUACY OF WARNING

The applicable law concerning the adequacy of warnings is set out in *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975), as follows:

A "defective condition" is not limited to defects in design or manufacture. The seller must provide with the product every element necessary to make it safe for use. One such element may be warnings and/or instructions concerning use of the product. A seller must give such warning and instructions as are required to inform the user or consumer of the possi-

ble risks and inherent limitations of his products.

. . . . .

It must be emphasized that the test of the necessity of warnings or instructions is not to be governed by the reasonable man standard. In the strict liability context we reject standards based upon what the "reasonable" consumer could be expected to know or what the "reasonable" manufacturer could be expected to "foresee" about the consumers who use his product. *Compare Maize v. Atlantic Refining Co.*, 352 Pa. 51, 41 A.2d 850 (1945); *Thomas v. Avron [Arvon] Products Co.*, 424 Pa. 365, 227 A.2d 897 (1967) ... rather, the sole question here is whether the seller accompanied his product with sufficient instructions and warnings so as to make his product safe. This is for the jury to determine. The necessity and adequacy of warnings in determining the existence of a defect can and should be considered with a view to all the evidence. The jury should view the relative degrees of danger associated with use of a product since a greater degree of danger requires a greater degree of protection.

Id. at 902.

 A manufacturer may be liable for the failure to adequately warn where its warning is not prominent, and not calculated to attract the user's attention to the true nature of the danger due to its position, size or coloring of its lettering. *Spruill v. Boyle–Midway, Inc.*, 308 F.2d 79 (4th Cir. 1962). A warning may be found to be inadequate if its size or print is too small or inappropriately located on the product. *Holmes v. Sahara Coal Co.*, 131 Ill.App.3d 666, 475 N.E.2d 1383 (1985). The warning must be sufficient to catch the attention of persons who could be expected to use the product, to apprise them of its dangers, and to advise them of the measures to take to avoid these dangers. *Dambacher by Dambacher v. Mallis*, 336 Pa.Super. 22, 485 A.2d 408, 426 (1984). *See also Maize v.*

*Atlantic Refining Co.*, 352 Pa. 51, 41 A.2d 850 (1945). The adequacy of the warning is a question of fact for the jury, *Dougherty v. Hooker Chemical Corp.*, 540 F.2d 174 (3rd Cir.1976), and expert testimony is admissible on the issue of adequacy. Dr. Stephen Wilcox, a Ph.D. in experimental psychology, expressed his opinion that the warning contained on the can was defective and inadequate. He pointed out that it was a highly pressurized, extremely flammable product and received disproportionate use by teenagers, which would call for a more explicit warning mindful of teenagers' inclination not to follow instructions. According to Dr. Wilcox, the warning should advise a consumer what to do if the can did not work [4] and that it should have used a symbol because people don't tend to read the writing on cans. He opined that the warning should be more explicit, such as, "IMMINENT DEATH—DANGER", in order to alert the consumer to serious consequences in using a product storing enormous amount of energy. Additionally, he claimed the warning was not appropriately placed on the can inasmuch as it was on the back and nestled among other language so that it blended in and didn't "jump out at you." He also said the warning should have been segregated and of a different color to make it stand out.

Dr. Harold Tanyzer, Professor from Hofstra University, who teaches youngsters about warning labels, also testified that the warning was not adequate or effective. He testified that to be an effective warning it must alert the user and explain specifically what the hazards are. He said that the three signal words most commonly used are "Danger", "Warning", and "Caution." According to Dr. Tanyzer, the warning should be placed on the top of the can where it would be most viewable and should be large, bold and bright to attract the reader's attention. He noted specifically,

> ... their warning is defective. It's defective because it lacks conspicuousness,

---

**4.** The exemplar can which Dr. Wilcox recommended contained the following language: "If spray valve fails to work, replace cap and exchange this can at any store where Aqua Net is sold".

it lacks prominence, it doesn't segregate the warnings in terms of their hazards, it doesn't tell you the precautions in a way that will give you the consequences of what can happen to you, and it's buried within the text, in sense of trying to find it.

(N.T. 4/2/92, p. 24)

This evidence, among others, provided sufficient foundation for a jury to conclude that the warnings on the can in question were inadequate and did not sufficiently inform the user of the possible risks in the product. Thus, a finding that the warnings were insufficient to satisfy Faberge's obligation to provide every element necessary to make the product safe for its intended use is supported by the evidence.

■■■■ As to causation, liability for failure to warn exists "when there is sufficient evidence that a warning might have made a difference." *Powell v. J.T. Posey Company*, 766 F.2d 131, 135 (3rd Cir.1985); *Conti v. Ford Motor Co.*, 743 F.2d 195 (3rd Cir.1984). Here, there was specific testimony from Dr. Tanyzer that a better warning "might" have made a difference and "would have greatly decreased the chances this accident would have taken place." He stated further, "[i]n my opinion, had an appropriate warning label been used, in all likelihood, this accident might have never happened." Finally, he opined that the defective warning was a "significant" factor in causing plaintiff's injuries.

■■■■ Additionally, the plaintiff testified that had the writing been on top of the can, as it was on the exemplar, she would have noticed it and been able to read it. She said specifically that she would not have tried to open the can if it contained language that it would be replaced if the valve failed to work. She explained that she didn't read the language on the back of the can because it consisted of "little, tiny words" and didn't believe "it said anything." Even when a warning is provided, the failure to read it does not necessarily bar recovery where the plaintiff is challenging the adequacy of the efforts of the manufacturer to communicate the dangers of the product to the buyer or user. *White*

*v. W.G.M. Safety Corp.*, 707 F.Supp. 544 (S.D.Ga.1988). Notwithstanding a failure to read, a jury could conclude that the danger was sufficiently great that the warning should have been presented in a way immediately obvious to even a casual reader. *Stapleton v. Kawasaki Heavy Industries, Inc.*, 608 F.2d 571, 573 (5th Cir. 1979). An ineffective warning is tantamount to no warning at all and a manufacturer cannot rely upon a warning which was insufficient to prevent the injury. *See Spruill v. Boyle–Midway Incorporated*, 308 F.2d 79, 87 (4th Cir.1962). She did read, however, the large words on the can that stated "AQUA NET HAIR SPRAY" and "33% MORE." This was consistent with plaintiff's expert testimony that if the warning had been more prominent and better positioned and not buried with other language on the can, that it would attract a user's attention.

■■■ "In order for the plaintiff to raise a jury question as to whether the failure to warn of latent dangers was the cause-in-fact and proximate cause of his or her injuries, there must be enough evidence to support a reasonable inference, rather than a guess, that a warning may have prevented the accident." *Petree v. Victor Fluid Power, Inc.*, 831 F.2d 1191, 1195 (3rd Cir. 1987). The plaintiff is only required to show by a preponderance of the evidence that the defendant's conduct may have been a substantial factor in causing harm to her, *i.e.*, may have changed the unsafe behavior which ultimately contributed to the plaintiff's injury. *Petree*, at 1196. The test for proximate cause is whether the defendant's conduct was a "substantial cause" or an "insignificant cause" and "the determination of the issue simply involves the making of a judgment as to whether the defendant's conduct although a cause in the "but for" sense is so insignificant that no ordinary mind would think of it as a cause for which a defendant should be held responsible". *Ford v. Jeffries*, 474 Pa. 588, 379 A.2d 111, 114 (1977).

The opinion testimony that different warnings might have made the difference; that the warning placed on top of the can

would be noticed; that more prominent warnings would be visible; and that the warnings as contained on the can were nestled in obscurity on the back of the can and didn't "jump out at you" as should be expected, established the inadequacy of the warning.

It is clear that a jury could find that the warnings given were inadequate; that adequate warnings would have caused the plaintiff to notice them and be able to read them; that notice as to what should be done if the can failed to function properly would have caused the plaintiff to refrain from attempting to open the can; and, consequently, that the defective warning was a significant factor in causing plaintiff's injuries.

## II.

### NEW TRIAL

Defendant cites six (6) reasons in support of its request for a new trial.

1. Defendant continues to argue that the jury should not have been instructed on the issues of defective valve system and inadequate warnings. The pertinent factual background and the applicable law were reviewed extensively in the preceding consideration of the motion for judgment n.o.v. That analysis establishes that this argument is unsupportable and it will be rejected.

2. As to the objections to the exemplar warning cans and the Aqua Net spray can marketed in Canada, they were admitted to show how stronger and more visible warnings could have been placed on the can by Faberge. The fact that more stringent warnings are placed on the Canadian cans because they are required by Canadian law is of no moment. There was no mention of the Canadian legal requirement in the presence of the jury but, even if there were, it would not impair or negate the reason for which it was admitted. The exemplars were used to illustrate and buttress the testimony of plaintiff's experts and were also probative for that reason.

3. A Consumer Product Safety Commission document and the Faberge Consumer Complaint Monitor of 1988 were admitted to show that Faberge was aware of malfunctioning of the valve systems, as well as puncturing of cans including puncturing near open flames. Dr. Carl Abraham testified that Faberge was aware of, and had access to, the Commission document. This evidence was admissible on the question of foreseeability which Faberge vigorously challenged, as well as a foundation for the opinions by plaintiff's experts. Moreover, the bulk of the complaints concerned failures to spray which corroborated plaintiff's malfunction claim.

4. Over objection, Dr. Maurice Siegel, formerly employed by Faberge as Chief of Quality Control and Product Development, was allowed to testify concerning the increased danger in the use of hydrocarbons, butane and propane in place of fluorocarbons because of their flammability. Faberge had argued that the fluorocarbons were flammable and that there was no increase in danger due to the substituted hydrocarbons. Consequently, it was permissible to allow testimony on that disputed issue. Moreover, the focus of Dr. Siegel's testimony was on the alleged design defect, a theory rejected by the jury.

5. Defendant also contends that Dr. Steven Wilcox, a Ph.D. and Human Factors Expert, should not have been allowed to testify as to appropriate labeling because his testimony was cumulative. The testimony was pertinent, of assistance to the jury and was not cumulative.

6. Finally, defendant complains that the in-court demonstration spraying Aqua Net Hair Spray near a flame was prejudicial. Dr. Siegel stated that the substitution of hydrocarbons for fluorocarbons as a propellant created a more hazardous product and so informed the marketing department. Dr. Carl Abraham, a chemist with a Ph.D. in Physical and Organic Chemistry, testified at length concerning the extreme flammability of the product, describing it as a hidden hazard similar to a "bomb in a can". He demonstrated how rapidly and intensely the spray with the new propellant would ignite when exposed

**500**

to flame. This was relevant to corroborate plaintiff's experts' testimony as well as to reveal the type of ignition that took place when plaintiff punctured the can. Further, it would be probative to support plaintiff's contention that, mindful of the danger involved, the manufacturer should have provided a stronger and more visible warning to consumers.

### III.

Defendant's motions have been carefully considered and are held to be without merit. Accordingly, the motion for judgment n.o.v. and/or for a new trial will be denied.