**Glodzik v. Whink Products Co.**

242

C.P. of Lackawanna County, no. 98 CV 4997.

*Lawrence J. Moran,* for plaintiff.
*Gerald J. Hanchulak,* for defendant.

NEALON, *J.,* April 14, 2003—The manufacturer of a rust stain remover containing hydrofluoric acid which severely injured the plaintiff has filed a motion for summary judgment seeking the dismissal of: (1) all tort claims on the grounds that plaintiff allegedly misused the product without gloves; (2) plaintiff's failure-to-warn claim

which is purportedly preempted by the Federal Hazardous Substances Act (FHSA); and (3) plaintiff's claim for punitive damages. Since reasonable minds could differ as to whether plaintiff's actions constituted unforeseeable, outrageous or extraordinary misuse, the defendant is not entitled to judgment in its favor as a matter of law. With respect to defendant's federal preemption argument, inasmuch as the plaintiff asserts that the defendant's product warning did not comply with the labeling requirements of the FHSA, she does not seek to impose labeling standards higher than those set forth in the federal Act and her challenge to the adequacy of the defendant's warning is not preempted. Additionally, triable issues of fact exist as to whether the defendant acted willfully, wantonly or recklessly in distributing a household product with known hazardous properties and, as such, the defendant is not entitled to summary judgment with respect to plaintiff's punitive damages claim.

## I. FACTUAL BACKGROUND

On October 22, 1996, plaintiff, Margaret Mary Glodzik used a rust stain remover manufactured and sold by defendant, Whink Products Co., in an effort to remove rust stains from her tablecloths. Glodzik had not utilized Whink's rust stain remover prior to that date and was apparently unaware of the fact that it contained hydrofluoric acid. As Glodzik was treating the tablecloths with the rust stain remover, she wore gloves during certain applications, but not at all times, and her hands, arm, neck and ears inadvertently came into contact with the stain remover. (See docket entry no. 1, ¶¶5-8; docket entry no. 31, p. 33; docket entry no. 32, pp. 10-11.)

According to the expert report of Kenneth H. Brown Ph.D., hydrofluoric acid "is an insidiously dangerous chemical acid in that it can cause permanent bone and deep tissue damage without any prior warning of pain from the acid's contact with a person's skin." (*Id.* no. 28, exhibit "B," p. 4.) Hydrofluoric acid burns undergo a two-stage process of injury; an initial stage of dehydration induced necrosis of the skin, and a second stage whereby the corrosive acid is absorbed through the skin and penetrates into the deep subdermal layers of the skin with release of free fluoride ion and corresponding reaction with tissue calcium. (*Id.* at p. 14.) Hence, hydrofluoric acid burns do not cause symptoms until several hours after the onset of the two-stage process, and victims of its stealthy osmosis do not timely appreciate the urgent need for immediate, continuous rinsing with large quantities of water and prompt medical attention. (*Id.* pp. 21-24.)

As a result of her exposure to, and contact with, the hydrofluoric acid contained in Whink's stain remover, Glodzik sustained severe hydrofluoric acid burns to her hands, arm, neck and ears causing epidermolysis, demarcation and necrosis of the skin, full thickness skin loss, compartment syndrome, web space granulation with contracture, adhesions of the flexor tendons, chronic web infection, contracture of the ligaments and joints, and permanent loss of sensation in both hands. Glodzik's hydrofluoric acid burns have necessitated numerous surgical procedures, including multiple amputations of her fingers, syndactylus release of the fingers with a free flap due to skin loss, multiple nail ablations, debridements, skin grafts, and several surgical reconstructions. (Docket entry no. 1, ¶¶22, 41, 59.)

In her complaint, Glodzik advances three causes of action against Whink. First, Glodzik maintains that the rust stain remover was defectively designed and formulated for consumer use since it contains hydrofluoric acid even though Whink could have developed an equally effective and less hazardous rust stain remover without that chemical.[1] (*Id.* ¶¶15, 18-21.) Count II of the complaint asserts a strict liability claim predicated upon Whink's failure to provide an adequate label warning that hydrofluoric acid is absorbed through the skin and "insidiously penetrates into the deep subdermal layers of the skin rendering rinsing or soaking in warm water an ineffective treatment to hydrofluoric acid exposure." (*Id.* ¶37.) Last, Glodzik asserts a common-law negligence claim and alleges that Whink acted recklessly in producing and dispensing a rust stain remover for consumer use which contained an unnecessary and highly corrosive acid. (*Id.* ¶¶50-66.) In addition to demanding compensatory damages, Glodzik also seeks punitive damages and avers that Whink engaged in "outrageous conduct" and "acted with reckless indifference to the interests of others" by manufacturing and selling a house-

---

1. Plaintiff's expert conducted a comparative performance-based analysis with 12 other rust stain removers which do not contain hydrofluoric acid and concluded that "there are other chemicals available to manufacturers such as Whink Product Co. which are equally effective, or even more effective, than hydrofluoric acid in rust stain removal but which do not pose the risk of injury and permanent damages inherent in the use of hydrofluoric acid." (*Id.* no. 28, exhibit "B", pp. 11-12.) Dr. Kenneth H. Brown further notes that other chemicals such as benzene and trichloroethylene with vapor exposure limits that are actually more tolerable than hydrofluoric acid have already "been banned from consumer products because they are considered too dangerous for direct consumer use." (*Id.* pp. 19-20.)

hold product containing hydrofluoric acid. (*Id.* ¶¶29, 48, 66.)

On January 15, 2003, Whink filed the instant motion for summary judgment arguing that this action should be dismissed since Glodzik's partial use of the stain remover without heavy duty rubber gloves allegedly constitutes product misuse as a matter of law. Alternatively, Whink contends that Glodzik's failure-to-warn claim is preempted by the Federal Hazardous Substances Act, 15 U.S.C. §1261 et seq., and is thereby subject to dismissal. Finally, Whink asserts that Glodzik's claim for punitive damages should be stricken due to the absence of any outrageous, wanton, or recklessly indifferent conduct on its behalf. The parties have submitted their supporting and opposing memoranda of law, and following the completion of oral argument on April 9, 2003, this matter became ripe for disposition.

## II. DISCUSSION

### (A) *Standard of Review*

Summary judgment may be granted only in those cases where the record clearly demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Cresswell v. Pennsylvania National Mutual Casualty Ins. Co.,* 820 A.2d 172, 177 (Pa. Super. 2003). In determining whether summary judgment is appropriate, the record must be viewed in the light most favorable to the non-moving party and all doubts regarding the existence of an issue of material fact must be resolved against the movant who

bears the burden of proving the absence of a factual dispute. *Al's Café Inc. v. Sanders Insurance Agency,* 820 A.2d 745, 748 (Pa. Super. 2003); *Downey v. Crozer-Chester Medical Center,* 817 A.2d 517, 524 (Pa. Super. 2003). "[O]nly when the facts are so clear that reasonable minds cannot differ, may a trial court property enter summary judgment." *Cresswell, supra.* Thus, "[s]ummary judgment may only be granted in cases where it is clear and free from doubt the moving party is entitled to judgment as a matter of law." *David Pflumm Paving & Excavating Inc. v. Foundation Services Co.,* 816 A.2d 1164, 1167 (Pa. Super. 2003).

## (B) *Unforeseeable Misuse Defense*

Pennsylvania has adopted section 402A of the Restatement (Second) of Torts which imposes strict liability upon the manufacturer or seller of a product in "a defective condition unreasonably dangerous to the consumer or user." *Craley v. Jet Equipment & Tools Inc.,* 778 A.2d 701, 705 (Pa. Super. 2001). To recover in a strict products liability case, a plaintiff must prove that: (1) the product was defective; (2) the defect existed at the time the product left the hands of the manufacturer or seller; and (3) the defect caused the injury. *Demmler v. SmithKline Beecham Corp.,* 448 Pa. Super. 425, 430-31, 671 A.2d 1151, 1153-54 (1996), *appeal denied,* 546 Pa. 655, 684 A.2d 557 (1996). There are three types of defective conditions which may give rise to strict liability: design defect, manufacturing defect, and failure-to-warn defect. *Walton v. Avco Corp.,* 530 Pa. 568, 576, 610 A.2d 454, 458 (1992); *Weiner v. American Honda Motor Co. Inc.,* 718 A.2d 305, 307 (Pa. Super. 1998). Glodzik maintains

that the rust stain remover was defective since (a) it was designed or composed to include an ultra hazardous chemical, *i.e.*, hydrofluoric acid, and (b) its label failed to adequately warn consumers about the dangers associated with that acid. In a defective design case, "the question is whether the product should have been designed more safely for its intended use." *Schindler v. Sofamor Inc.*, 774 A.2d 765, 772 (Pa. Super. 2001), *appeal denied*, 567 Pa. 727, 786 A.2d 989 (2001). "A design defect will be found where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." *Commonwealth, Department of General Services v. United States Mineral Products Co.*, 809 A.2d 1000, 1027 (Pa. Commw. 2002). Plaintiff's expert, Dr. Kenneth H. Brown, has opined that the unnecessary presence of hydrofluoric acid in Whink's household rust stain remover renders it unsafe for its intended consumer use, as evidenced by the documented recommendations of hydrofluoric acid manufacturers that this highly toxic substance not be included in consumer products. (See docket entry no. 28, exhibit "B," p. 22.)

Under a failure-to-warn theory, "[a] product may be deemed defective if it lacks adequate warnings or instructions necessary for safe use of the product." *Demmler, supra* at 431, 671 A.2d at 1154. A warning defect will be found to exist if "the user was not adequately instructed on how to use the product as the product was designed," *Weiner,* 718 A.2d at 309, or where the product was "distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product." *Davis v. Berwind Corp.*, 547 Pa. 260, 267, 690 A.2d 186, 190 (1997). In evaluating the adequacy of a warn-

ing, "[t]he jury should view the relative degrees of danger associated with use of the product since a greater degree of danger requires a greater degree of protection." *Nowak v. Faberge U.S.A. Inc.,* 812 F. Supp. 492, 497 (M.D. Pa. 1992) (Nealon, J.), *aff'd,* 32 F.3d 755 (3d Cir. 1994).

Even if a warning is substantively sound, it may nevertheless be inadequate if its location, size, coloring or prominence is not properly calculated to "catch the attention" of consumers or users. As the Third Circuit Court of Appeals has remarked:

"A manufacturer may be liable for failure to adequately warn where its warning is not prominent, and not calculated to attract the user's attention to the true nature of the danger due to its position, size, or coloring of its lettering. A warning may be found to be inadequate if its size or print is too small or inappropriately located on the product. The warning must be sufficient to catch the attention of persons who could be expected to use the product, to apprise them of its dangers, and to advise them of the measures to take to avoid these dangers." *Pavlik v. Lane/Tobacco Exporters International,* 135 F.3d 876, 887 (3d Cir. 1998) (quoting and expressly adopting *Nowak, supra*).

Furthermore, the plaintiff's actual failure to read a warning label does not necessarily bar recovery "where the plaintiff is challenging the adequacy of the efforts of the manufacturer to communicate the dangers of the product to the buyer or user." *Pavlik,* 135 F.3d at 886 (quoting *Nowak,* 812 F. Supp. at 498). "This is because manufacturers cannot rely upon a presumption that the victim read a warning to shield themselves from liability for

warnings that are inadequate precisely because they are not presented in a manner sufficient to attract the user's attention." *Pavlik,* 135 F.3d at 887.

Dr. Brown has posited that Whink's warning concerning the need to use "heavy duty household rubber gloves" is inadequate since a consumer wearing such gloves may nonetheless suffer hydrofluoric acid burns from the slightest spilling or splashing of the rust stain remover or the mere handling of the dripping bottle after it has been opened or used. See *e.g., DeHaan v. Whink Products Co.,* 1994 WL 24322, *4 (N.D. Ill. 1994) ("a fairly regular user" of Whink Rust Stain Remover who "wore rubber gloves" while attempting to clean clothing with the stain remover "spilled one drop of the product on her thigh" which "soaked through her lightweight sweatpants and came into contact with her skin" and "ultimately caused a severe chemical burn over an area approximately 24 1/2 inches by 19 inches, across the thigh and crotch area"). According to Dr. Brown, "[I]n order to adequately protect oneself, the minimum protective equipment should include coveralls with long sleeves, a face shield, a cover for the top of one's head and rubber gloves made of neoprene or other impervious material with long sleeves." (See docket entry no. 28, exhibit "B" pp. 12, 16.) Since the warning does not notify the consumer of the need for such minimum protective equipment, Dr. Brown submits that it does not adequately instruct the consumer regarding appropriate precautionary measures for safe use of the product. See also, Weissman, *A "Comment J" Parry To Howard Latin's "Good" Warnings, Bad Products, and Cognitive Limitations,* 70 St. John's L.Rev. 629 (Fall 1996).

Dr. Brown further believes that the wording of Whink's label relating to the prospect of burns "falls far short of telling the consumer of the insidious latent dangers of getting hydrofluoric acid on the skin." (*Id.,* p. 13.) With regard to the necessity for medical treatment following contact with the substance, Dr. Brown has reasoned that "[t]he omission from the label to warn or direct the consumer to get *immediate* attention is a failing of the label." (*Id.*) (emphasis in original) Based upon the foregoing, Glodzik argues that Whink's rust stain remover is defective in two respects: (1) a design defect attributable to the inclusion of hydrofluoric acid in a consumer product; and (2) a failure-to-warn defect for not adequately informing consumers about inherent dangers, indicated precautions and immediate remedial measures.

Whink contends that Glodzik's strict liability and negligence claims must be dismissed on the grounds that she misused the product by neglecting to wear heavy duty rubber gloves at all times of product use. Although a plaintiff's contributory negligence does not bar recovery in a strict products liability case, a plaintiff's misuse of a product may negate the causation element of a strict liability claim. See *Clark v. Bil-Jax Inc.,* 763 A.2d 920, 923 (Pa. Super. 2000). To demonstrate misuse of a product, the defendant manufacturer or seller must show that the use employed by the plaintiff was either unforeseeable or outrageous. *Childers v. Power Line Equipment Rentals Inc.,* 452 Pa. Super. 94, 108, 681 A.2d 201, 208 (1996), *appeal denied,* 547 Pa. 735, 690 A.2d 236 (1997); *Padillas v. Stork-Gamco Inc.,* 2000 WL 1470210, *6 n.5 (E.D. Pa. 2000). "The misuse must be extraordinary and 'whether the act is reasonably foreseeable is to be determined by following retrospectively the sequence of

events and looking back from the harm to the negligent act rather than by considering whether the defendant should prospectively have envisioned the events which unfolded and caused the accident.'" *Nowak,* 812 F. Supp. at 496 (quoting *Baker v. Outboard Marine Corp.,* 595 F.2d 176, 183 (3d Cir. 1979)). "Normally, the issue of whether conduct involved in misuse is foreseeable is to be resolved by the jury." *Dougherty v. Edward J. Meloney Inc.,* 443 Pa. Super. 201, 224, 661 A.2d 375, 386 (1995), *appeal denied,* 544 Pa. 608, 674 A.2d 1072 (1996). See also, *Petree v. Victor Fluid Power Inc.,* 831 F.2d 1191, 1195 (3d Cir. 1987) ("Under Pennsylvania law, only un-foreseeable contributory conduct by the consumer will insulate the manufacturer from strict products liability, and the question of foreseeability is for the jury."); *Nowak, supra* (same).

Based upon the available record, we are unable to declare as a matter of law that reasonable minds could not possibly differ as to whether Glodzik's use of the stain remover without gloves constituted an outrageous, unforeseeable or extraordinary misuse of the product. See *Pavlik,* 135 F.3d at 887-88 (denying summary judgment and rejecting the argument that an individual who died of self-administered butane inhalation from a butane can had "deliberately disregarded" the product's warnings "in an attempt to misuse the product for the sole purpose of getting high" and finding that a "reasonable jury" could deem the warning inadequate because of its type, size and location). Whink obviously contemplated that consumers might use the rust stain remover without gloves since it recommended glove use, albeit in small print, on both the front and back panel of the bottle. Thus, Whink is hard-pressed to claim that it was unforeseeable that

consumers may use the product while not wearing gloves. See *Nowak,* 812 F. Supp. at 496 (refusing to find misuse as a matter of law and holding that a jury could find a consumer's puncturing of a hair spray can as foreseeable since "the warnings on the can specifically advised against puncturing and avoiding proximity to a flame and, consequently, it is difficult to understand how the manufacturer can claim that the puncturing in this case near a flame was unforeseeable.") As stated above, Glodzik's failure to read Whink's label does not foreclose recovery since she is challenging the adequacy of that warning. *Pavlak,* 145 F.3d at 886; *Nowak,* 812 F. Supp. at 498.

Moreover, it was also foreseeable to Whink that a consumer wearing gloves while using the product could nevertheless suffer a hydrofluoric acid burn. See *e.g., DeHann, supra.* Glodzik's hydrofluoric acid burns to her arm, neck and ears would have occurred despite the use of gloves to protect her hands. A reasonable jury could conclude that Whink's product label should, therefore, recommend coveralls with long sleeves, a face shield and a head cover as minimum precautionary measures. Accordingly, under the facts of this case, it cannot be said as a matter of law that Glodzik's actions clearly constituted unforeseeable, outrageous or extraordinary misuse and Whink's motion for summary judgment on that basis will be denied.

## (C) *Federal Regulatory Preemption*

Whink alternatively argues that Glodzik's failure-to-warn claim is subject to the supremacy provisions of the FHSA which preempt state law claims premised on the

failure to provide adequate warnings. The FHSA defines a "hazardous substance" as any substance or mixture of substances which, inter alia, is toxic, corrosive, or an irritant "if such substance or mixture of substances may cause a substantial personal injury . . . during or as a proximate result of any customary or reasonably fore-seeable handling or use . . . ." 15 U.S.C. § 1261(f)(1)(A). A "misbranded hazardous substance" is identified by section 2(p) of the FHSA as any hazardous substance failing to bear a label:

"(1) which states conspicuously (A) the name and place of business of the manufacturer, packer, distributor or seller; (B) the common or usual name or the chemical name (if there be no common or usual name) of the hazardous substance or of each component which contributes substantially to its hazard, unless the commission by regulation permits or requires the use of a recognized generic name; (C) the signal word 'Danger' on substances which are extremely flammable, corrosive, or highly toxic; (D) the signal word 'Warning' or 'Caution' on all other hazardous substances; (e) an affirmative statement of the principal hazard or hazards, such as 'flammable,' 'combustible,' 'vapor harmful,' 'causes burns,' 'absorbed through skin,' or similar wording descriptive of the hazard; (F) precautionary measures describing the action to be followed or avoided, except when modified by regulation of the commission pursuant to 15 U.S.C. § 1262; (G) instruction, when necessary or appropriate, for first-aid treatment; (H) the word 'poison' for any hazardous substance which is defined as 'highly toxic' by subsection (h); (I) instructions for handling and storage of packages which require special care in handling or storage and (J) the statement (i) 'Keep out of the reach

of children' or its practical equivalent, or, (ii) if the article is intended for use by children and is not a banned hazardous substance, adequate directions for the protection of children from the hazard, and

"(2) on which any statements required under subparagraph (1) of this paragraph are located prominently and are in the English language in conspicuous and legible type in contrast by typography, layout, or color with other printed matter on the label." 15 U.S.C. §1261 (p)(1)-(2).

Whink submits that its warning label affixed to the rust stain remover bottle clearly satisfies the federal labeling requirements of the FHSA which preempts Glodzik's state law failure-to-warn claim. But, see *Duplin v. Whink Products Co.,* 1994 WL 197612, *2 (Conn. Super. 1994) (consumer's product liability claim that the Whink rust stain remover label "failed to provide adequate product warnings and emergency instructions" was not preempted by the FHSA).

Whink has submitted an exemplar bottle of its rust stain remover which is 7 1/4 inches in height and 3 1/2 inches in width. Approximately 4 3/4 inches down from the top of the bottle appears a front label which is 2 1/4 inches wide and 1 3/4 inches high and reads:

"Danger: May be fatal or cause permanent damage. Causes severe burns which may not be immediately painful or visible. Vapor harmful. Contains hydrofluoric acid. Keep out of reach of children. Use only with heavy duty household rubber gloves. Read back panel for additional precautions." (See docket entry no. 27, exhibit "A".)

The back panel of the Whink bottle also contains labeling which is 4 1/2 inches high and 2 1/2 inches wide and displays the following language:

"*Danger—Poison*

"Avoid contact with skin or eyes do not taste, swallow or breathe

"Antidote: Medical care required. Physician Alert Specific antidotal treatment may be required. Product and/or emergency information—call (515) 858-3456 First Aid Immediately do the following: Skin—remove contaminated clothing. Flush skin with cool water for 15 minutes. Eyes—flush with cool water. Remove contact lenses, if any, and continue to flush with cool water for at least 15 minutes. Swallowed—rinse mouth with cool water. Drink large glass of water or milk. Do not cause vomiting. Then Get Immediate Medical Care.

"Directions: Wear heavy duty household rubber gloves. Do not use with other household cleaners. Avoid contact on any surface not stated in directions, including countertops, stainless steel sinks and bathtubs.

"Use On Clothing. Carpeting: Test for color fastness. Dampen stain with water. Apply a few drops of Whink to stain. When stain is gone, rinse stain area thoroughly with cold water and launder clothing as usual before wearing. Avoid contact with washer and dryer surfaces, sinks. Use only on white sinks. Wipe over stain area with damp pad containing Whink. Rinse immediately with cold water. Repeat if necessary. Rinse or discard pad. Toilet bowls: Use only on white bowls. Spray Whink around and above waterline. As Whink runs down the side, the rust stain will disappear. Flush. Repeat on deep stains." Whink Products Co., Eldora, IA. 50627 © W.P.C. 1987. (*Id.*)

Glodzik concedes that the Whink label provides the information required by subsections (A), (B), (C), (D),

(H), (I) and (J) of section 2(p)(1) of the FHSA. However, Glodzik maintains that Whink's label does not satisfy subsections (E), (F) and (G) of section 2(p)(1). Glodzik submits, and Whink admits, that any hydrofluoric acid present in the rust stain remover can be absorbed through the skin. Therefore, Glodzik argues that although the foregoing warning references the prospect of severe burns, it does not properly reflect an affirmative statement that the chemical is "absorbed through skin" as required by 15 U.S.C. §1261(p)(1)(E). Furthermore, inasmuch as the label does not identify the need for "coveralls with long sleeves, a face shield, a cover for the top of one's head and rubber gloves made of neoprene or other impervious material with long sleeves," nor does it caution about the necessity of immediate medical treatment following contact with skin, Glodzik asserts that it is also deficient under section 1261(b)(1)(F) and (G) governing precautionary measures and instructions for first-aid treatment.

Whink's preemption argument is predicated upon the Superior Court holdings in *Romah v. Hygienic Sanitation Co.,* 705 A.2d 841 (Pa. Super. 1997), *aff'd,* 558 Pa. 378, 737 A.2d 249 (1999), and *Coffey v. Minwax Company Inc.,* 764 A.2d 616 (Pa. Super. 2000). In *Romah,* the court considered whether a consumer's strict liability claims against a pesticide manufacturer were preempted by the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §136 et seq. Section 136v of the FIFRA contains an express preemption provision which states that no state may "impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter." *Romah,* 705 A.2d at 847 (quoting 7

U.S.C. §136v (b)). Based upon this express preemption provision, the *Romah* court concluded that the consumer's failure-to-warn claims seeking to impose additional or different labeling requirements than those set forth in the FIFRA were clearly preempted by the Act, but that any state law claims for negligent design, manufacture and testing and/or failure to disclose known toxic effects to the EPA were not preempted. *Id.* at 853-54. In so holding, the *Romah* court relied upon "the long-standing statutory canon that cautions 'it is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct.' " *Id.* at 854 (quoting *Silkwood v. Kerr-McGee Corp.,* 464 U.S. 238, 251 (1984)).

In *Coffey,* the Superior Court addressed whether the FHSA preempts a consumer's state law claims regarding product warnings or labels. Unlike the FIFRA, which provides for specific regulatory approval of labels and express preemption of state law warning claims, the FHSA does not authorize specific approval of product labeling by the Consumer Products Safety Commission, nor does it include express preemption language. Compare *Medtronic v. Lohr,* 518 U.S. 470 (1996) (section 360k(a) of the Medical Device Amendments (MDA) to the Food, Drug and Cosmetic Act, 21 U.S.C. §360k(a), specifically preempted non-identical state law requirements); *Cipollone v. Liggett Group Inc.,* 505 U.S. 504 (1992) (Public Health Cigarette Smoking Act, 15 U.S.C. §1334(b), expressly preempted state law requirements governing cigarette advertisements or labels). Nevertheless, the explanatory notes which accompany section 2(p) of the FHSA indicate that no state "may establish or continue in effect a cautionary labeling requirement appli-

cable to such substance or packaging and designed to protect against the same risk of illness or injury *unless such cautionary labeling requirement is identical to the labeling requirement under* [15 U.S.C. §§1261(p), 1262(b)]." 15 U.S.C. §1261, note (b)(1)(A) (1988). (emphasis added) Consequently, the *Coffey* court concluded that state law claims relating to product warnings or labeling are preempted by the FHSA unless the state law requirement is identical to the FHSA's labeling mandate. *Coffey,* 764 A.2d at 619-20.

However, Glodzik is not attempting to impose additional or more elaborate labeling requirements than those set forth in the FHSA. Rather, she asserts that Whink's labeling does not satisfy the requirements of section 2(p)(1)(E), (F) and (G) governing affirmative statements of principal hazards (*i.e.,* absorption through skin), precautionary measures and first-aid treatment. Glodzik does not agree with Whink's contention that its label fulfills Whink's warning obligation under the FHSA. Since Glodzik is predicating her failure-to-warn claim on Whink's failure to comply with the federal labeling requirements of the FHSA, her inadequate warning claim is not preempted by the FHSA.[2] *Milanese v. Rust-Oleum Corp.,* 244 F.3d 104, 109-10 (2d Cir. 2001) ("we agree

---

2. In those instances in which state law tort claims have been found to be preempted by the FHSA, there was no dispute that the manufacturer's warnings satisfied the FHSA's labeling requirements. See *e.g., Coffey, supra; Comeaux v. National Tea Co.,* 81 F.3d 42, 43 (5th Cir. 1996) ("it is undisputed that [defendant's] lighter fluid is subject to the FHSA and that [defendant's] warnings fully complied with the FHSA and the regulations thereunder."); *Jones Chemical Inc. v. Seier,* 871 S.W.2d 611, 614 (Mo. Ct. App. 1994) (both parties agreed that defendant had complied with the labeling requirements of the FHSA).

with [plaintiff], however, that a state cause of action alleging non-compliance with the FHSA would *not* be preempted by the Act.") (emphasis in original); *Torres-Rios v. LPS Laboratories Inc.,* 152 F.3d 11, 13 (1st Cir. 1998) (plaintiff may succeed in a state law products liability claim by demonstrating that defendant's warnings failed to satisfy the FHSA labeling standards). As such, Whink's motion to dismiss Glodzik's failure-to-warn claim will be denied.

### (D) *Punitive Damages*

Whink likewise challenges the viability of Glodzik's claim for exemplary damages. To justify an award of punitive damages, the wrongful conduct of the defendant must be "outrageous." Conduct is considered to be outrageous if it is intentional, willful, wanton, *Slappo v. J's Development Associates Inc.,* 791 A.2d 409, 417 (Pa. Super. 2002), malicious, oppressive, *Jahanshahi v. Centura Development Co. Inc.,* 816 A.2d 1179, 1188 (Pa. Super. 2003), or "done with a bad motive or with a *reckless indifference* to the interests of others." *Judge Technical Services Inc. v. Clancy,* 813 A.2d 879, 889 (Pa. Super. 2002). (emphasis in original) Willful or wanton conduct requires a state of mind in which the tort-feasor realizes the danger and disregards it to such a degree as to evince "a conscious indifference to the perpetration of the wrong." *Lewis v. Miller,* 374 Pa. Super. 515, 520, 543 A.2d 590, 592 (1988); *Dean v. Community Medical Center,* 46 D.&C.4th 334, 345 (Lacka. Cty. 2000). "Reckless indifference" refers to an intentional act "of an unreasonable character, in disregard to a risk known to [the tort-feasor] or so obvious that he must be taken to have

been aware of it, and so great as to make it highly probable that harm would follow." *McClellan v. HMO of Pennsylvania,* 413 Pa. Super. 128, 145, 604 A.2d 1053, 1061 (1992), *appeal denied,* 532 Pa. 664, 616 A.2d 985 (1992); *Zazzera v. Roche,* 54 D.&C.4th 225, 231-32 (Lacka. Cty. 2001).

Therefore, for conduct to be considered reckless, *"[i]t must involve an easily perceptible danger of death or substantial physical harm, and the probability that it will so result must be substantially greater than is required for ordinary negligence." Hall v. Jackson,* 788 A.2d 390, 403 (Pa. Super. 2001) (emphasis in original); *Zazerra,* 54 D.&C.4th at 232. The determination of whether a defendant's actions constitute outrageous or reckless conduct lies within the sound discretion of the fact-finder. *SHV Coal Inc. v. Continental Grain Co.* 526 Pa. 489, 495, 587 A.2d 702, 705 (1991); *Trotman v. Mecchella,* 421 Pa. Super. 620, 625, 618 A.2d 982, 985 (1992). For that reason, the court should decide the viability of a punitive damages claim under Pennsylvania law "only when no reasonable inference from the facts alleged supports a punitive award." *Anderson v. Nationwide Insurance Enterprise,* 187 F. Supp.2d 447, 460 (W.D. Pa. 2002); *Eagle Traffic Control v. Addco,* 889 F. Supp. 200, 201 (E.D. Pa. 1995) (citing *Trotman, supra*).

It is apparent from the reproduced record that Whink was cognizant of hydrofluoric acid's propensity to subtly cause catastrophic and disfiguring injuries to consumers. See *DeHaan, supra; Duplin, supra.* Indeed, Pennsylvania tort law is replete with instances of disastrous burns caused by contact with hydrofluoric acid. See *e.g., Malitovsky v. Harshaw Chemical Co.,* 360 Pa. 279, 282,

61 A.2d 846, 848 (1948) (affirming verdict for plaintiff burned by hydrofluoric acid and describing that chemical as "a most dangerous substance."); *Levy v. Rosenblatt,* 21 Pa. Super. 543 (1902) (upholding verdict for plaintiff who sustained "permanent wrist drop and paralysis of the wrist joint" and "burns that resulted in abscesses" from submerging opal glass eggs "into a tank containing a solution of hydrofluoric acid, consisting of 52 parts of hydrofluoric acid, 48 parts of water"). Accord *Beck v. Woodward Affiliates,* 226 A.D.2d 328, 330, 640 N.Y.S.2d 205, 208 (1996) ("The use of hydrofluoric acid to clean the facade of a building in a public place is an inherently dangerous activity, and it is foreseeable that pedestrians who come into contact with the exterior of a building on which this chemical has been applied or improperly removed would be injured."). Notwithstanding that fact, Whink placed this ultra hazardous substance into the stream of consumer commerce even though, according to Dr. Brown, Whink's rust stain remover could have functioned as effectively without hydrofluoric acid.

Other jurisdictions have recognized that Whink's use of hydrofluoric acid in its household rust stain remover is tantamount to "willful and wanton conduct." See *e.g., DeHaan v. Whink Products Co.,* 1995 WL 27401, *3 (N.D. Ill. 1995) (holding that consumer had "sufficiently alleged a claim for willful and wanton conduct" based upon Whink's "awareness that its product poses a danger or has previously caused injury coupled with a failure to act to reduce the risk . . ."). It is conceivable that a jury could regard Whink's actions as willful, wanton or evincing a reckless indifference for the safety and rights of others. Since a punitive damages claim may be dismissed only if no reasonable inference from the facts

alleged can support such an award, Whink's motion to strike Glodzik's claim for punitive damages will be denied.

## ORDER

And now, April 14, 2003, upon consideration of the motion for summary judgment filed by defendant Whink Products Co., the memoranda of law submitted by the parties, and the oral argument of counsel on April 9, 2003, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that the motion for summary judgment of defendant Whink Products Co. is denied.