Ogozaly v. American Honda Motor Co. Inc.

C.P. of Lackawanna County, no. 98 CV 2647.

*Daniel W. Munley,* for plaintiff.
*Marc E. Wolin,* for defendant.

NEALON, *J.,* March 16, 2004—Presently pending for disposition is the second motion of plaintiff John F. Ogozaly for leave of court to serve financial wealth discovery upon defendant American Honda Motor Co. Inc. pursuant to Pa.R.C.P. 4003.7. Unlike his earlier request, Ogozaly's current motion and supporting exhibits aver facts establishing a prima facie basis for recovering punitive damages from Honda. Therefore, for the reasons set forth below, his motion for leave of court to conduct financial wealth discovery will be granted subject to the parties' execution of a confidentiality agreement regulating the dissemination of that discovery.

## I. PROCEDURAL HISTORY

Ogozaly commenced this action against Honda based upon an accident which occurred on June 15, 1996, when a three-wheeled all terrain vehicle (ATV) manufactured

by Honda allegedly overturned while Ogozaly was operating it, causing him to suffer severe injuries and paralysis. (See dkt. entry no. 4, ¶5.) Ogozaly has asserted claims for strict liability, misrepresentation, breach of warranty and negligence for which he seeks to recover compensatory and punitive damages. (*Id.,* ¶¶16, 20, 26, 32, 37, 42.) Honda did not file preliminary objections to Ogozaly's claim for punitive damages, nor has it sought to dismiss that claim by way of summary judgment.

Ogozaly originally presented a motion for leave of court to conduct discovery under Pa.R.C.P. 4003.7 by obtaining information and documents regarding Honda's wealth or net worth in connection with his punitive damages claim. Honda opposed Ogozaly's request on the grounds that Ogozaly had not identified a specific defect in the subject ATV or articulated any outrageous, willful or wanton conduct by Honda that would warrant a claim for punitive damages. (*Id.,* no. 55, pp. 2, 9.) Honda argued at that time that because of Ogozaly's "complete and utter failure to produce any evidence in the past five years regarding a defect, American Honda should not be forced to produce financial data relating to punitive damages at this time." (*Id.,* no. 50, p. 4.)

By memorandum and order dated June 9, 2003, we interpreted Rule 4003.7 as incorporating the common-law requirement that obligates a plaintiff to aver specific facts establishing a prima facie basis for recovering punitive damages as a condition precedent for securing financial wealth discovery. *Ogozaly v. American Honda Motor Co. Inc.,* 104 Lacka. Jur. 354, 357-61 (2003). Since Ogozaly had not alleged any facts substantiating his punitive damages claim, we denied his motion for leave to

serve discovery under Rule 4003.7. However, we expressly noted that the denial of Ogozaly's discovery motion was without prejudice and stated:

"Our denial of Ogozaly's motion will be without prejudice to his right to seek discovery at a later date regarding Honda's wealth in the event he produces an expert report, identifies the defect at issue, and furnishes a factual basis for his punitive damages claim. [citations omitted] For that reason, an order will be entered denying Ogozaly's discovery motion without prejudice to his right to revisit this issue following the completion of discovery, assuming arguendo that he is able to identify a factual basis for his punitive damages claim." *Id.* at 361-62.

Ogozaly subsequently produced liability reports from a design and warnings expert, Edward W. Karnes Ph.D., a product safety expert, William F. Kitzes J.D., of Consumer Safety Associates, a motorcycle dynamics consultant, Mr. Randy Nelson, and a professional engineer and certified safety professional, Michael A. Burleson P.E., CSP.[1] Ogozaly maintains that "these reports both identify the design defects at issue and provide a factual basis for [his] punitive damages claims." (Dkt. entry no. 61, p. 9.) As a result, he has submitted a second "Motion for leave of court to serve discovery pursuant to Pa.R.C.P. 4003.7." (*Id.,* no. 60.) Honda objects to Ogozaly's discovery request and contends that his expert "reports do not even remotely approach the standard established" in our earlier ruling as "they merely supply blanket

---

1. Ogozaly has also produced expert reports from four damages witnesses, but, since those reports do not address the liability or punitive damages questions at issue, they will not be discussed in this discovery ruling.

conclusory opinions against American Honda without any factual basis, without any empirical data to support them, without any analysis as to how the alleged defect caused the accident, and without any demonstration that an alternative design existed." (*Id.,* no. 63, p. 4.) Thus, it is necessary to consider the substance of Ogozaly's expert reports to determine whether they provide a sufficient basis for financial wealth discovery under Rule 4003.7.

## II. FACTUAL BACKGROUND

Dr. Edward W. Karnes has authored a 13-page report addressing Honda's three-wheeled ATV design and warnings, their causal relationship to Ogozaly's accident, and Honda's alleged knowledge of the ATV's defective design, inadequate warnings and foreseeable risks prior to Honda's manufacture of the subject ATV. The specific defects identified by Dr. Karnes include its "rider-active design involving the three-wheeled configuration, the short wheel base, the narrow track, the solid rear axle, and the high center of gravity." The rider-active design allegedly makes "stability and maneuverability . . . solely a function of the operator's ability to use appropriate body movements and weight shift" and "provides a minimal margin of error for the operator to react to loss-of-control situations that can occur suddenly" because of the three-wheeled ATV's susceptibility to tip or roll over. (Dkt. entry no. 60, exhibit A, pp. 2, 6.) According to Dr. Karnes, this design defect rendered the ATV "unreasonably dangerous" and was a "substantial cause" of Ogozaly's accident and injuries. (*Id.,* p. 2.)

Dr. Karnes is also critical of the warnings and safety information which accompanied Honda's three-wheeled ATV and states that they failed to adequately "alert a user that the ATV because of its short length, narrow track, high center of gravity, absence of a differential, and its three-wheeled configuration, will tip or flip over suddenly and without warning during routine riding maneuvers." He remarks that the warnings are deficient for neglecting to inform the operator about the need for safety training and protective equipment prior to operating the vehicle. Dr. Karnes believes that Ogozaly's "inability to successfully maintain stability of the vehicle" was attributable to "his inadequate knowledge of specific hazards associated with the design" and that the warning defect was a substantial cause of the accident and injuries. (*Id.,* pp. 2-3.)

The bulk of the Karnes' report quotes from Honda documents, correspondence and testimony which reportedly reflect proof of Honda's knowledge of the ATV's defects and ATV operators' ignorance of the vehicle's unreasonable dangerousness prior to the manufacture of the Ogozaly ATV. Dr Karnes quotes at length from Honda memoranda from the mid-1980s acknowledging that the three-wheeled ATV "is more difficult to operate than it appears" since "[j]ust turning the handle bars will not turn the vehicle" such that operators "have to use [their] whole body to keep balance and to control the ATV." (*Id.,* p. 8.) His report chronicles a dispute which arose between Honda and U-Haul International over U-Haul's use of more prominently displayed and strenuously worded warnings on Honda's ATVs which were leased to customers by U-Haul. On September 7, 1984, a Honda

representative forwarded a letter to U-Haul stating that Honda was "surprised and dismayed, in a number of ways, at your company's apparent feeling that an additional label was necessary on U-Haul's ATVs." Honda objected to U-Haul's use of "the universal poison sign, *i.e.,* the skull and crossbones" and its enlarged warnings stating that "ALL ATVs CORNER STRANGELY—SEE USER'S GUIDE" and "ATVs FLIP EVERY WHICH WAY—SEE USER'S GUIDE." Honda characterized the labels as "misleading and untrue" and requested "in the strongest possible way that [U-Haul] remove these labels immediately." (*Id.,* pp. 3-4.)

Honda also reminded U-Haul that under their indemnity agreement, Honda agreed to defend and indemnify U-Haul in product liability lawsuits "so long as the product was delivered to the customer without modification of any kind as when it was delivered by [Honda] to U-Haul." Honda advised U-Haul that it considered U-Haul's addition of its own "warning label as a modification and as a violation of that [indemnity] agreement," thereby suggesting that Honda would not defend and indemnify U-Haul in ATV litigation unless the warning labels were removed. (*Id.,* p. 4.) U-Haul representatives replied to Honda in separate letters dated September 14, 1984, stating that Honda's "existing decals have some serious deficiencies with regard to warning our customers" and that U-Haul's additional decal "is a vastly more readable, appropriate, and proper legal warning to users than the unreadable and inadequate warning that the Honda decal provided." (*Id.,* pp. 4-5.) Nevertheless, Honda never adopted a facsimile of the U-Haul warnings on its three-wheeled ATVs.

Dr. Karnes' report likewise quotes from written communications that Honda received from Polaris Industries in 1985 setting forth recommended changes to Honda's warnings. Polaris Industries stated, inter alia, that "the three-wheelers should have a hang tag on it (sic) at the point of sale telling a prospective buyer that four-wheelers are safer or more stable," that Honda "should recommend only four-wheelers for non-adults," and that "[t]he warnings should relate the seriousness of not heeding the warnings—be sure the consumer knows that death or serious injury can result." However, those recommendations were reportedly ignored by Honda. (*Id.,* p. 5.)

The Karnes' report references a variety of other materials which ostensibly document "Honda's knowledge of users' misperceptions of safety" and its knowledge of "the stability risks of its ATVs." (*Id.,* pp. 6, 8-9.) Dr. Karnes opines that this "illusion of stability and safety" was created "by Honda's deceptive and misleading advertising" regarding the safety of three-wheeled ATVs. (*Id.,* p. 6.) Honda's advertising and promotional materials purportedly represented that three-wheeled ATVs "were safe, stable, easy to operate and usable on all terrains" and Honda's commercials "portrayed carefree uses of the vehicle" with "children performing daring feats in apparent safety." (*Id.,* p. 11.) The video "ads failed to inform the viewers that the [featured] riding was performed by experienced and professional riders—some of whom experienced loss-of-control situations during the filming sequences." (*Id.*) Honda's advertisements allegedly misled the consuming public about the true dangers inherent in ATVs by creating this "illusion of stability and safety." (*Id.*)

Furthermore, although Honda had received a host of safety alerts from the Consumer Protection Safety Commission (CPSC) concerning accidents and injuries associated with three-wheeled ATVs, it apparently neglected to provide that information to its dealers. Rather, as more consumers purchased the safer four-wheelers and existing inventories of three-wheeled ATVs resultantly grew, Honda encouraged its "dealers to move out their present inventories of three-wheelers," and urged them to keep their demonstration rides "as short as possible" and to avoid the "wild demo with wheelies and runs on two wheels [that] may be all right for the teenager or enthusiastic adult" but not for the mother "if she is observing" as she must "be convinced of the machine's stability and safety." (*Id.*, pp. 7, 10.) Dr. Karnes submits that Honda ignored mounting evidence of deaths and serious injuries from design and warnings deficiencies in the three-wheeled ATVs and continued to aggressively promote that product as safe despite this knowledge. (*Id.*, p. 10.)

Dr. Karnes quotes extensively from Honda records that pre-date the manufacture of Ogozaly's ATV and which evidence Honda's knowledge of the need for formal training programs for ATV operators prior to their operation of ATVs. Internal memoranda from "as early as the mid-1970s" state that Honda's ATVs "do not handle at all like motorcycles and specialized training is needed to ride [them]" and conclude that Honda could "put together a program that will not be costly to [Honda] and [could] be implemented and staffed by the dealers." (*Id.*, p. 12.) Additionally, in its own testimony before the U.S. House Subcommittee on Commerce, Consumer and Monetary Affairs, Honda described its "evidence, both from the

public and private sectors, that training in the use of this vehicle is effective in reducing accident rates." *(Id.)* Notwithstanding that fact, Honda did not develop or implement such a training program for its ATV customers and instead relied solely upon its owner's manuals. *(Id.,* pp. 12-13.)

Similar assertions are contained in the product safety report of William Kitzes. In his 16-page report, Mr. Kitzes notes that "[a]s early as March, July and August of 1984, clearly before the subject ATV was manufactured, in successive letters to Tetsuo Chino, President of American Honda, the Consumer Products Safety Commission had informed Honda of the 'dramatic rise in the number of injuries associated with three-wheeled ATVs and stated they were 'extremely concerned.' '" (Dkt. entry no. 60, exhibit C, p. 3.) Mr. Kitzes observes that in December 1984, the CPSC and the ATV industry safety organization, Specialty Vehicle Institute of America (SVIA), jointly issued a consumer safety alert designed to inform consumers of ATV dangers and the high number of injuries and deaths associated with ATV use. Despite the fact that the safety alerts were reissued in March 1985, August 1985 and June 1986 as the injury statistics grew, Honda failed to distribute these alerts to purchasers or operators of ATVs even though its own "representative was the chairman of the SVIA Board of Trustees." *(Id.,* p. 4.)

Not unlike Dr. Karnes, Mr. Kitzes refers to Honda's testimony before the House Subcommittee acknowledging "that safety awareness and training would result in lowering the accident rate and increasing the safety of its customers" and that "training programs can signifi-

cantly reduce accidents." Nonetheless, Honda purportedly failed to implement any training programs and continued to market the ATVs "as safe family fun over 'all terrain' when they knew that there were specific limitations to the safety of the vehicles." (*Id.*, p. 4.) In addition, Honda's "[t]elevision advertisements depicted Honda ATVs traversing rough terrains and being easily driven by children." Its print ads affirmatively represented that ATVs could travel "practically effortlessly," "over an astonishing array of terrain," "over rocks and fallen logs," "darn near everywhere," "easily over most obstacles," "tackling the just-about impossible" and over "some of the most tortuous terrain on earth." Mr. Kitzes maintains that Honda published these advertisements even though it knew that such operation "was often not true." (*Id.*, p. 5.)

Mr. Kitzes references many of the same Honda documents that were quoted in Dr. Karnes' report. The Kitzes report also discusses the CPSC's notice to Honda in August 1984 that it was "extremely concerned about the dramatic increase in injuries associated with ATVs and the apparent doubling of injuries between 1983 and 1984." The CPSC suggested rider training, dealer programs, safety publicity and promotion, mailing safety data to ATV owners, standards for labeling and instruction, and paid advertisements and TV ads to address these issues. (*Id.*, p. 6.) Mr. Kitzes notes that in 1985, the SVIA likewise recommended a mass mailing "to increase awareness of safe riding practices and actually prevent injuries." (*Id.*, p. 7.) These events culminated with the CPSC vote on December 12, 1986, authorizing commencement of an enforcement action against Honda un-

der the Consumer Product Safety Act to implement "a refund program that would essentially recall all three-wheeled ATVs" by allowing "consumers to return their ATVs to the manufacturer for a reasonable refund." The refund program sought by the CPSC "also included a requirement to provide notice and warnings to all past, present, and future ATV owners and users about catastrophic ATV injuries and the danger of rolling over, among other safety issues." (*Id.,* p. 9.) However, the refund program was never implemented by Honda. *(Id.)*

After citing a host of other reports and records, Mr. Kitzes concludes that "Honda's continuous promotion of [its] ATVs as safe family fun is at odds with [its] ever-growing knowledge of the unreasonably dangerous conditions created by the foreseeable use of [its] ATVs." His report notes that "it is clear that Honda had prior notice and was well aware of the dangers associated with the foreseeable use of ATVs prior to John Ogozaly's catastrophic injury." Hence, he opines:

"Given Honda's knowledge of hundreds of thousands of injuries and deaths associated with ATVs; given Honda's knowledge of the defective and unreasonably dangerous characteristics of [its] ATVs; given Honda's knowledge of the latent and unexpected nature of the danger to ATV users; and given the tens of millions of dollars Honda spent to promote ATVs as safe family fun despite [its] knowledge of the dangers; it is apparent that Honda acted with clear, conscious and reckless disregard for the safety of ATV users." (*Id.,* p. 13.)

Ogozaly's motorcycle dynamics consultant, Mr. Randy Nelson, has investigated over 1,000 ATV accidents and

has authored technical papers addressing ATV safety, stability and maneuverability which have been published by the Society of Automotive Engineers. (Dkt. entry no. 60, exhibit D, pp. 1, 4.) Mr. Nelson has indicated that ATVs "will tip easily although appearing very stable and friendly" and "will resist turning and at times be difficult to maintain directional control." Since its "three-wheel design and live axle . . . resist turning unless the inside tire is allowed to slip against the ground," simple turning maneuvers require "special techniques to allow the traction of the front tire to overcome that of the inside tire." *(Id.,* p. 4.) Moreover, "[s]light changes in speed, terrain, body position, or braking can affect the operator's ability to compensate for the vehicle's instability," and, in light of its triangular wheeled shape, "[i]f one rear wheel encounters an uneven terrain feature, a roll motion is transmitted to the ATV, the rear wheels cannot articulate and the whole vehicle will tip." *(Id.,* p. 5.) Mr. Nelson submits that the ATV "should have a longer wheel base, wider track width, and a center of gravity that would allow the ATV to slip the tires against the ground rather than tip the vehicle." *(Id.)* Mr. Nelson expresses the opinion that Ogozaly's ATV "was being operated in a reasonable and foreseeable manner at the time of the accident" and that its defective condition was "the proximate cause of this accident and Mr. Ogozaly's injuries." *(Id.)*

Finally, Ogozaly's engineering expert, Michael A. Burleson P.E., CSP, has authored a seven-page report identifying alleged design deficiencies which were the "direct cause" of the Ogozaly accident. Specifically, Mr. Burleson indicates that "[t]he triangular geometry of the three-wheel all terrain vehicle produces a tip axis formed

between the front tire and either rear tire." (Dkt. entry no. 60, exhibit B, p. 4.) He observes that "[t]he relatively high positioning of the system center of mass of this vehicle and rider, combined with a short wheel base and narrow track, results in the propensity of the three-wheel all terrain vehicle to upset with small to moderate forces created through turns, acceleration, deceleration modes, and/or terrain inputs." (*Id.,* pp. 4-5.) He further states that years of testing "have shown conclusively time and time again that the geometry of the three-wheel ATV design causes the vehicle to upset or the rider to lose control much too easily during turns, deceleration, or terrain feature encounters" and "that four-wheel all-terrain vehicles provide greater lateral stability" during those same activities. (*Id.,* p. 5.)

Accordingly, Mr. Burleson concludes that Ogozaly's ATV "was defective with respect to its design and inherent lateral instability" since its "short wheel base and high system center of gravity results in the propensity of this vehicle to suddenly and unavoidably either upset or change direction causing a loss of operator control when encountering moderate terrain features or operator input at virtually any speeds above five miles per hour." He maintains that Honda knew or should have known "that the addition of a fourth wheel to the vehicle design would significantly increase the lateral stability" and "that the failure to remove these three-wheel ATVs from the marketplace would result in . . . injuries and fatalities." (*Id.,* p. 6.) Mr. Burleson argues that "Honda has known for many years this type of three-wheel ATV has the propensity to upset and cause severe injuries and death," yet "[t]here is no evidence [Honda] has ever tested op-

erator protection devices to protect the operator in the event of a foreseeable upset." (*Id.,* p. 7.)

Against this factual background, Honda contends that "a review of [Ogozaly's] expert reports reveals that [Ogozaly] is not any closer to averring specific facts to establish a legitimate basis for his punitive damages claim than before the expert reports were produced." (Dkt. entry no. 63, p. 15.) Honda avers that "[b]ecause these reports do not establish a prima facie case for punitive damages, [Ogozaly] should not be permitted to probe into American Honda's financial value." (*Id.,* p. 4.) Ergo, we must determine whether Ogozaly's experts have adequately identified the alleged defects in the Ogozaly ATV and have articulated factual grounds for a prima facie basis for punitive damages.

## III. DISCUSSION

### (A) *Strict Liability Claims*

Honda first contends that Ogozaly's experts have not sufficiently described a defect in the subject ATV which caused Ogozaly's accident and injuries. Pennsylvania has adopted section 402A of the Restatement (Second) of Torts which imposes strict liability upon the manufacturer or seller of a product in "a defective condition unreasonably dangerous to the consumer or user." *Craley v. Jet Equipment & Tools Inc.,* 778 A.2d 701, 705 (Pa. Super. 2001). To recover in a strict products liability case, a plaintiff must prove that: (1) the product was defective; (2) the defect existed at the time the product left the hands of the manufacturer or seller; and (3) the defect

caused the injury. *Demmler v. SmithKline Beecham Corp.,* 448 Pa. Super. 425, 430-31, 671 A.2d 1151, 1153-54 (1996), *appeal denied,* 546 Pa. 655, 684 A.2d 557 (1996). There are three types of defective conditions which may give rise to strict liability: design defect, manufacturing defect, and failure-to-warn defect. *Walton v. Avco Corp.,* 530 Pa. 568, 576, 610 A.2d 454, 458 (1992); *Weiner v. American Honda Motor Co. Inc.,* 718 A.2d 305, 307 (Pa. Super. 1998).

In a defective design case, "the question is whether the product should have been designed more safely for its intended use." *Schindler v. Sofamor Inc.,* 774 A.2d 765, 772 (Pa. Super. 2001), *appeal denied,* 567 Pa. 727, 786 A.2d 989 (2001). A design defect will be found where the product "left the supplier's control lacking any element necessary to make it safe for its *intended use* or possessing any feature that renders it unsafe for the *intended use.*" *Phillips v. Cricket Lighters,* 576 Pa. 763, 841 A.2d 1000, 1005 (2003) (emphasis in original); *Commonwealth, Department of General Services v. United States Mineral Products Co.,* 809 A.2d 1000, 1027 (Pa. Commw. 2002). If the plaintiff proceeds under a crash-worthiness or second collision theory by arguing that a design defect did not cause the accident but did cause or enhance the degree of injuries suffered, the plaintiff must also demonstrate that an alternative, safer, practicable design existed. *Harsh v. Petroll,* 840 A.2d 404, 417 (Pa. Commw. 2003); *Colville v. Crown Equipment Corp.,* 809 A.2d 916, 922-23 (Pa. Super. 2002).

Under a failure-to-warn theory, "[a] product may be deemed defective if it lacks adequate warnings or instructions necessary for safe use of the product."

*Demmler, supra* at 431, 671 A.2d at 1154. A warning defect will be found to exist if "the user was not adequately instructed on how to use the product as the product was designed," *Weiner,* 718 A.2d at 309, or where the product was "distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product." *Davis v. Berwind Corp.,* 547 Pa. 260, 267, 690 A.2d 186, 190 (1997). In evaluating the adequacy of a warning, "[t]he jury should view the relative degrees of danger associated with use of the product since a greater degree of danger requires a greater degree of protection." *Nowak v. Faberge U.S.A. Inc.,* 812 F. Supp. 492, 497 (M.D. Pa. 1992) (Nealon, J.), *affirmed,* 32 F.3d 755 (3d Cir. 1994).

Even if a warning is substantively sound, it may nevertheless be inadequate if its location, size, coloring or prominence is not properly calculated to "catch the attention" of consumers or users. As the Third Circuit Court of Appeals has remarked:

"A manufacturer may be liable for failure to adequately warn where its warning is not prominent, and not calculated to attract the user's attention to the true nature of the danger due to its position, size, or coloring of its lettering. A warning may be found to be inadequate if its size or print is too small or inappropriately located on the product. The warning must be sufficient to catch the attention of persons who could be expected to use the product, to apprise them of its dangers, and to advise them of the measures to take to avoid these dangers." *Pavlik v. Lane/Tobacco Exporters International,* 135 F.3d 876, 887 (3d Cir. 1998) (quoting and expressly adopting *Nowak, supra*). Moreover, the plaintiff's actual failure

to read a warning label does not necessarily bar recovery "where the plaintiff is challenging the adequacy of the efforts of the manufacturer to communicate the dangers of the product to the buyer or user." *Pavlik,* 135 F.3d at 886 (quoting *Nowak,* 812 F. Supp. at 498). "This is because manufacturers cannot rely upon a presumption that the victim read a warning to shield themselves from liability for warnings that are inadequate precisely because they are not presented in a manner sufficient to attract the user's attention." *Pavlik,* 135 F.3d at 887.

Ogozaly's experts have identified design defects which include the three-wheeled ATV's triangular configuration, short wheel base, narrow track, solid rear axle, high center of gravity, and absence of a differential that make it overly susceptible to tipping and rolling during normal operation at safe speeds. These experts opine that the ATV should have a longer wheel base, wider track width, and a center of gravity that would permit the tires to slip against the ground rather than tip the vehicle. They identify the four-wheeled ATV as a safer, alternative design and state that the addition of a fourth wheel significantly increases the ATV's lateral stability. Thus, Ogozaly's liability experts have more than adequately addressed the alleged design deficiencies in Honda's three-wheeled ATV.

Ogozaly's experts have further identified apparent inadequacies in Honda's warnings and labels which accompanied the ATVs. Relying primarily upon documents authored or received by Honda representatives, Ogozaly's experts describe what they maintain are glaring infirmities in Honda's warning labels. The expert reports raise triable issues of fact regarding the sub-

stance, location and prominence of the Honda warnings and the resultant failure-to-warn defect in Ogozaly's ATV. Despite Honda's contentions to the contrary, Ogozaly's experts have properly identified design and warning defects in the subject ATV, as well as the causal relationship between those defects and Ogozaly's accident and injuries.

### (B) *Prima Facie Right to Punitive Damages*

By virtue of the Supreme Court holding in *Kirkbride v. Lisbon Contractors Inc.,* 521 Pa. 97, 102, 555 A.2d 800, 803 (1989), the wealth of a defendant has been deemed a relevant factor for a jury to consider in determining an award of punitive damages. See *Hollock v. Erie Insurance Exchange,* 842 A.2d 409, 419 (2004); *Judge Technical Services Inc. v. Clancy,* 813 A.2d 879, 889 (Pa. Super. 2002). A defendant's net worth has been recognized "as a valid measure of its wealth" for purposes of punitive damages. See *Sprague v. Walter,* 441 Pa. Super. 1, 61-64, 656 A.2d 890, 920-21 (1995), *appeal denied,* 543 Pa. 730, 673 A.2d 336 (1996). The disclosure of financial wealth information is now governed by Pa.R.C.P. 4003.7 which provides that "[a] party may obtain information concerning the wealth of a defendant in a claim for punitive damages only upon order of court setting forth appropriate restrictions as to the time of the discovery, the scope of the discovery, and the dissemination of the material discovered." (Pa.R.C.P. 4003.7.) We must determine whether Ogozaly has demonstrated a prima facie right to recover punitive damages under Pennsylvania law so as to be entitled to wealth discovery under Rule 4003.7.

To justify an award of punitive damages, the wrongful conduct of the defendant must be "outrageous." Conduct is considered to be outrageous if it is intentional, willful, wanton, *Slappo v. J's Development Associates Inc.,* 791 A.2d 409, 417 (Pa. Super. 2002), or "done with a bad motive or with a reckless indifference to the interests of others." *Judge Technical Services Inc., supra.* Willful or wanton conduct requires a state of mind in which the tort-feasor realizes the danger and disregards it to such a degree as to evince "a conscious indifference to the perpetration of the wrong." *Lewis v. Miller,* 374 Pa. Super. 515, 520, 543 A.2d 590, 592 (1988); *Dean v. Community Medical Center,* 46 D.&C.4th 334, 345 (Lacka. Cty. 2000). "Reckless indifference" refers to an intentional act "of an unreasonable character, in disregard to a risk known to [the tort-feasor] or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." *McClellan v. HMO of Pennsylvania,* 413 Pa. Super. 128, 145, 604 A.2d 1053, 1061 (1992), *appeal denied,* 532 Pa. 664, 616 A.2d 985 (1992); *Zazzera v. Roche,* 54 D.&C.4th 225, 231-32 (Lacka. Cty. 2001). Therefore, for conduct to be considered reckless, "[i]t must involve an easily perceptible danger of death or substantial physical harm, and the probability that it will so result must be substantially greater than is required for ordinary negligence." *Hall v. Jackson,* 788 A.2d 390, 403 (Pa. Super. 2001); *Glodzik v. Whink Products Co.,* 61 D.&C.4th 241, 261 (Lacka. Cty. 2003).

The expert reports submitted by Ogozaly establish a prima facie basis for wanton or recklessly indifferent conduct on the part of Honda so as to expose it to the

prospect of an award of punitive damages. Honda's own internal memoranda arguably reflect its knowledge of unreasonably dangerous characteristics of the three-wheeled ATV and the large number of deaths and serious injuries resulting from defects in the ATV. Correspondence and notices that Honda received from U-Haul, Polaris Industries, the CPSC and SVIA conceivably demonstrate a conscious indifference to dangers that Honda appreciated with respect to the three-wheeled ATV's defects and the corresponding probability of death or serious injuries from those defects. Many of the same materials suggest that Honda continued to promote the three-wheeled ATV as a safe vehicle even in the face of strong evidence to the contrary. Taken as a whole, Ogozaly's submissions satisfy the prima facie requirement under Rule 4003.7 and state a cognizable claim for outrageous, wanton or recklessly indifferent conduct. See *e.g., Oberg v. Honda Motor Co. Ltd.,* 320 Or. 544, 553-55, 888 P.2d 8, 13 (Or. 1995) (punitive damages recoverable since the plaintiff introduced evidence that the defendants knew for many years prior to the plaintiff's ATV accident that the ATV model which the plaintiff was operating was prone to roll-over accidents and that "an agency of the United States government undertook to investigate the safety of ATVs."), *cert. denied,* 517 U.S. 1219 (1996).

In sum, we will grant Ogozaly's motion to conduct financial wealth discovery pursuant to Pa.R.C.P. 4003.7. At the time of oral argument on February 12, 2004, counsel for Ogozaly offered to execute a confidentiality agreement with Honda stipulating that Ogozaly would not divulge or disseminate Honda's financial information and

records to anyone other than Ogozaly's counsel, expert witnesses and consultants in this litigation. Therefore, the production of Honda's wealth discovery will be subject to the parties' execution of an appropriate confidentiality agreement.

## ORDER

And now, March 16, 2004, upon consideration of plaintiff's second "Motion for leave of court to serve discovery pursuant to Pa.R.C.P. 4003.7," defendant's response thereto, the materials submitted by the parties and the oral argument of counsel on February 12, 2004, and based upon the reasoning set forth above, it is hereby ordered and decreed that:

(1) Plaintiff's motion for leave of court to conduct discovery pursuant to Pa.R.C.P. 4003.7 is granted;

(2) Within the next 10 days, plaintiff and his counsel shall execute a confidentiality agreement with the defendant agreeing not to disclose or disseminate the defendant's financial wealth information or documentation to anyone other than the plaintiff's counsel, witnesses and consultants in this litigation, unless permitted to do so by further order of court;

(3) Within 30 days of the date of the parties' execution of the foregoing confidentiality agreement, defendant shall provide answers to the plaintiff's financial wealth discovery under Pa.R.C.P. 4003.7.